JOHN C. CRUDEN
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

DEBORAH A. GITIN (CA Bar No. 284947)
KARL J. FINGERHOOD (PA Bar No. 63260)
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
301 Howard Street, Suite 1050
San Francisco, California 94105
Telephone: (415) 744-6488
Facsimile: (415) 744-6476
Email: Deborah.Gitin@usdoj.gov

*Attorneys for Plaintiff United States of America*

*(Names and addresses of attorneys continued on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORNIA, on behalf of the Department of Toxic Substances Control and Toxic Substances Control Account,<br><br>                    Plaintiffs,<br><br>v.<br><br>ABEX AEROSPACE, et al.,<br><br>                    Defendants. | Case No. 2:16-cv-02696 -GW-E<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE**<br><br>Judge: Hon. George H. Wu<br><br>Date:   December 5, 2016<br>Time:   8:30 a.m.<br>Courtroom: 10 (Spring St.) |

HOPE SCHMELTZER
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 9
75 Hawthorne Street
San Francisco, California  94105
Tel: (415) 972-3218
Email: Schmeltzer.Hope@epa.gov

*Of Counsel for Plaintiff United States of America*

KAMALA D. HARRIS
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General
OLIVIA W. KARLIN (CA Bar No. 150432)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California  90013
Tel.: (213) 897-0473
Fax: (213) 897-2802
Email:  Olivia.Karlin@doj.ca.gov

*Attorneys for Plaintiff State of California*
*Department of Toxic Substances Control and Toxic Substances Control*
*Account*

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, on December 5, 2016 at 8:30 a.m., or as soon thereafter as counsel may be heard, the United States of America ("United States") and the State of California, on behalf of the Department of Toxic Substances Control and Toxic Substances Control Account ("DTSC") (collectively "Plaintiffs"), will appear in the Courtroom of the Honorable George H. Wu, Room 10, 312 N. Spring St., Los Angeles, CA 90012, and will move pursuant to Local Rule 7, for entry of a proposed Consent Decree recently lodged with the Court, relating to Operable Unit 2 ("OU2") of the Omega Chemical Corporation Superfund Site ("Site"):

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

The Plaintiffs filed a Complaint in this action on April 20, 2016, asserting claims for injunctive relief and recovery of costs under Sections 106(a) and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606(a) and 9607, and Section 7003 of the Resource Conservation and Recovery Act, as amended ("RCRA"), 42 U.S.C. § 6973.  (Doc. No. 1)  The Plaintiffs simultaneously lodged a Consent Decree that would resolve the civil claims alleged in the Complaint.  (Docs. No. 4 and 4-1)[1]  Pursuant to 28 C.F.R. § 50.7, the United States Environmental Protection Agency ("EPA") and DTSC published notice of the Consent Decree in the Federal Register on April 27, 2016, and accepted public comments for a period of thirty (30) days thereafter.  81 Fed. Reg. 24885-01 (Apr. 27, 2016).  The comments received are attached to the Memorandum in support of this Motion as Exhibits M through R, and responses to those comments are provided within the text of the Memorandum and as an attachment to Exhibit D of the Memorandum. The United States also held a public meeting near the Site, on August 18, 2016; there were no questions from the public at that meeting.  *See* Memorandum Ex. U (public meeting transcript).  Accordingly, for the reasons described in the supporting Memorandum below, the United States and DTSC respectfully request the Court to enter the Consent Decree.

This motion is based upon this Notice, the attached Memorandum, and the Declarations of Wayne Praskins, Marie Ortesi, and Sayareh Amirebrahimi, which

---

[1] The Plaintiffs subsequently filed a Notice of Errata Concerning Proposed Consent Decree and a proposed Corrected Consent Decree, to reflect ministerial changes made to the proposed Consent Decree with all signatories' agreement.  (Docs. No. 19 and 19-1) (Oct. 6, 2016).  All references to the Consent Decree in the attached Memorandum are intended to refer to the proposed Corrected Consent Decree (Doc. No. 19-1), which is attached to the Memorandum in support of this Motion as Exhibit A.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

appear as Exhibits B through D to the Memorandum.  The Defendants do not oppose this motion.

The positions laid out in the Stipulation Re: Limited Intervention Regarding Motion to Enter Consent Decree (Doc. No. 20) and the Court's Order entering that stipulation (Doc. No. 21) reflect the conference of Plaintiffs, Defendants, and Anticipated Intervenors' counsel pursuant to Local Rule 7-3 as of the time of filing of that stipulation, October 11, 2016.  The Anticipated Intervenors have stated an intention to file an opposition to this Motion.

Pursuant to Local Rule 7-20, the Plaintiffs are submitting a Proposed Order relating to entry of the Consent Decree.  However, the Plaintiffs respectfully request that this Court, in lieu of signing the Proposed Order, instead enter the Consent Decree by signing page 86 of the Consent Decree, which is attached to the Memorandum as Exhibit A.

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division

Dated: October 20, 2016          /s/ Deborah A. Gitin
                                 DEBORAH A. GITIN
                                 Environmental Enforcement Section
                                 Environment & Natural Resources Division
                                 United States Department of Justice

Dated: October 20, 2016          /s/ Olivia W. Karlin
                                 OLIVIA W. KARLIN
                                 Deputy Attorney General
                                 Attorney for the State of California
                                 Department of Toxic Substances Control
                                 and Toxic Substances Control Account

1
2
3

JOHN C. CRUDEN
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

4
5
6
7
8
9

DEBORAH A. GITIN (CA Bar No. 284947)
KARL J. FINGERHOOD (PA Bar No. 63260)
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
301 Howard Street, Suite 1050
San Francisco, California  94105
Telephone: (415) 744-6488
Facsimile: (415) 744-6476
Email: Deborah.Gitin@usdoj.gov

10
11

*Attorneys for Plaintiff United States of America*

12

*(Names and addresses of attorneys continued on following page)*

13
14
15

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

16
17
18
19
20
21
22
23
24

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORNIA, on behalf of the Department of Toxic Substances Control and Toxic Substances Control Account,<br><br>                    Plaintiffs,<br><br>v.<br><br>ABEX AEROSPACE, et al.,<br><br>                    Defendants. | Case No. 2:16-cv-2696 -GW-E<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE**<br><br>Judge: Hon. George H. Wu<br><br>Date: December 5, 2016<br>Time: 8:30am<br>Courtroom: 10 (Spring St.) |

25
26
27
28

HOPE SCHMELTZER
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 9
75 Hawthorne Street
San Francisco, California  94105
Tel: (415) 972-3218
Email: Schmeltzer.Hope@epa.gov

*Of Counsel for Plaintiff United States of America*

KAMALA D. HARRIS
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General
OLIVIA W. KARLIN (CA Bar No. 150432)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California  90013
Tel.: (213) 897-0473
Fax: (213) 897-2802
Email:  Olivia.Karlin@doj.ca.gov

*Attorneys for Plaintiff State of California*
*Department of Toxic Substances Control and Toxic Substances Control*
*Account*

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 1

II.    BACKGROUND ............................................................................................. 2

       A.    The Site ............................................................................................. 2
       B.    The Settling Defendants .................................................................... 3
       C.    Procedural History ............................................................................ 3
             1.  Brief Description of Prior Settlements and Response Actions .......... 3
             2.  The 2011 Record of Decision (ROD) for OU2 .................................. 4
             3.  General/Special Notice for Operable Unit 2 ...................................... 5
             4.  Lodging of this Proposed Consent Decree (Including Comments) .. 5

III.   SUMMARY OF THE PROPOSED CONSENT DECREE ........................... 6

       A.    Work Commitments ........................................................................... 6
       B.    Past and Future Response Costs; Additional Financial
             Commitments .................................................................................... 8
       C.    Covenants Not to Sue and Contribution Protection for Matters
             Addressed ......................................................................................... 8
       D.    Cost-Sharing Between the United States and OPOG Members for
             "Certain Noticed PRPs" .................................................................... 9
       E.    Other Agreements Regarding Future Settlements ............................ 10

IV.    ARGUMENT ................................................................................................. 10

       A.    Under the Applicable Legal Standard, the Court's Inquiry Is
             Deferential ........................................................................................ 12
       B.    The Settlement Is Fair ...................................................................... 14
             1.  The Fairness of This Settlement Should be Assessed in the
                 Aggregate ....................................................................................... 14
             2.  The Settlement is Procedurally Fair ................................................ 15
             3.  The Settlement is Substantively Fair ............................................... 17
       C.    The Settlement is Reasonable ........................................................... 20
       D.    The Settlement is Harmonious with CERCLA and RCRA ................. 21
       E.    The Public Comments Received Do Not Provide a Reason Not to Enter
             the Consent Decree ........................................................................... 21

1

      1.   Comments Re Fairness/Reasonableness of Consent Decree ........... 21

      2.   Requests for Edits to Consent Decree ..................................................... 24

      3.   Other Technical Comments Regarding Statement of Work ........... 25

V.     CONCLUSION .................................................................................................25

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alcoa, Inc., et al, v. APC Investments Co., et al.*,
   2:14-cv-06456-GW (C.D. Cal.) .................................................... 2, 6, 10, 11, 15

*Amoco Oil Co. v. Dingwell*,
   690 F.Supp. 78 (D. Maine 1988) ..........................................................19

*Arizona v. City of Tucson*,
   761 F.3d 1005 (9th Cir. 2014) .................................................... 13, 17

*Burlington Northern & Santa Fe Ry. Co. v. United States*,
   129 S.Ct. 1870 (2009) ..........................................................23

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*,
   710 F.3d 946 (9th Cir. 2013) ..........................................................12

*Citizens for a Better Env't v. Gorsuch*,
   718 F.2d 1117 (D.C. Cir. 1983)..........................................................13

*Marine Forests Soc. v. California Coastal Comm'n*,
   36 Cal.4th 1 (Cal. 2005) ..........................................................16

*Officers for Justice v. Civil Service Comm'n*,
   688 F.2d 615 (9th Cir. 1982) .................................................... 13-14

*People ex rel. Lockyer v. Superior Court (Cole National Corp.)*,
   122 Cal.App.4th 1060 (Ct. App. 2004) ..........................................................16

*S.E.C. v. Randolph*,
   736 F.2d 525 (9th Cir. 1984) ..........................................................12

*United States v. Aerojet General Corp.*,
   606 F.3d 3d 1142, 1150 (9th Cir. 2010) ..........................................................14

*United States v. Akzo Coatings of Amer., Inc.*,
   949 F.2d 1409 (6th Cir. 1991) .................................................... 13, 20

*United States v. Albert Inv. Co.*,
   58 5F.3d 1386, 1396 (10th Cir. 2009) ..........................................................14

*United States v. Allegheny-Ludlum Indus., Inc.*,

   517 F.2d 826 (5th Cir. 1975) ..................................................................13

*United States v. Bechtel Corp.*,

   648 F.2d 660 (9th Cir. 1981) ..................................................................13

*United States v. Cannons Eng'g Corp.,*

   *(Cannons I)*, 720 F. Supp. 1027 (D. Mass. 1989) ......................... 12, 13

*United States v. Cannons Eng'g Corp.,*

   *(Cannons II)*, 899 F.2d 79 (1st Cir. 1990).....................................11-14, 16-18, 20

*United States v. Charles George Trucking, Inc.*,

   34 F.3d 1081 (1st Cir. 1994) ..................................................................14

*United States v. Charter International Oil Company*,

   83 F.3d 510 (5th Cir. 1996) .............................................................. 17, 18

*United States v. Chevron U.S.A., Inc.*,

   380 F.Supp.2d 1104 (N.D. Cal. 2005)....................................................15

*United States v. Consolidation Coal Co.*,

   184 F.Supp.2d 723 (S.D. Ohio 2002)......................................................19

*United States v. Davis*,

   261 F.3d 1 (1st Cir. 2001) .............................................................. 11, 19

*United States v. Davis*,

   31 F.Supp.2d 452 (D.R.I. 1998) ............................................................19

*United States v. Fort James Operating Co.*,

   313 F.Supp.2d 902 (E.D. Wis. 2004) ....................................................18

*United States v. GenCorp Inc.*,

   935 F. Supp. 928 (N.D. Ohio 1996) .......................................................14

*United States v. Kramer*,

   19 F.Supp.2d 273 (D.N.J. 1998)....................................................... 14, 20

*United States v. Mid-State Disposal Inc.*,

   131 F.R.D. 573 (W.D. Wis. 1990).........................................................14

*United States v. Montrose Chem. Corp. of Calif.*,

   50 F.3d 741 (9th Cir. 1995) ................................................ 12-14, 17, 18

*United States v. Oregon*,

   913 F.2d 576 (9th Cir. 1990) ...................................................... 13, 15

*United States v. R.W. Meyer, Inc.*,

   889 F.2d 1497 (6th Cir. 1989) .............................................................23

*Williams v. Vukovich*,

   720 F.2d 909 (6th Cir. 1983) ..............................................................16

**Statutes**

42 U.S.C. § 6973 ....................................................................................21

42 U.S.C. § 9606(a) .................................................................................3

42 U.S.C. § 9607 ................................................................................ 3, 23

42 U.S.C. §9613(f)(1) ........................................................................ 11, 23

42 U.S.C. § 9613(f)(2) ...........................................................................11

42 U.S.C. § 9622(a) ...............................................................................12

42 U.S.C. § 9622(d)(1) ...........................................................................12

42 U.S.C. § 9622(e) .................................................................................5

42 U.S.C. § 9622(g)(7) .............................................................................9

**Rules**

Federal Rule of Civil Procedure 58 .......................................................25

**Regulations**

64 Fed. Reg. 2950-01 (Jan. 19, 1999) ....................................................4

81 Fed. Reg. 24885-01 (Apr. 27, 2016) ..................................................6

## I.    **INTRODUCTION**

Plaintiffs, the United States and DTSC, request that this Court enter the proposed Consent Decree described in the Notice of Motion above and set forth as Exhibit A to this Motion.  This Consent Decree is highly favorable to the public interest: it requires the 237 Settling Defendants to collectively fund and perform substantial groundwater cleanup at OU2 of the Omega Chemical Corporation Superfund Site, at an estimated cost of $70 million, and does not provide a Site-wide or OU2-wide release of liability to any Settling Defendant.  All viable parties, both settlors and nonsettlors, remain potentially available to perform additional cleanup work at OU2 in the future.  The Consent Decree also recovers over $8 million of the unreimbursed OU2 past costs that EPA and DTSC have already expended.[1]

The Settling Defendants – the 65 members of the Omega PRP Organized Group ("OPOG"), 169 additional parties that sent waste to the Omega Chemical Corporation, and three mid-plume owner/operators – organized themselves to present a joint settlement offer to EPA and DTSC, as is encouraged by CERCLA. They have collectively agreed to perform an estimated $70 million worth of cleanup work ("the Work") under EPA's oversight.  The Work includes groundwater extraction and treatment in the northern and central portions of the groundwater plume, which span approximately three miles – roughly two-thirds of the plume's current lateral extent.  Ex. D (Decl. of Wayne Praskins) ¶8.  The Settling Defendants also commit to perform investigative work necessary to guide EPA's remedial decision in the lower portion of the plume, and to pay EPA's and DTSC's oversight costs for the Work, preventing additional public costs from mounting.

---

[1] EPA's unreimbursed OU2 past costs are approximately $23 million and DTSC's are $70,000.  Ex. B (Decl. of Marie Ortesi) ¶6; Ex. C (Decl. of Sayareh Amirebrahimi) ¶4.

The Plaintiffs received four adverse public comments from nonsettling PRPs that have not been sued by the Plaintiffs at OU2 but are defendants in the private *Alcoa* litigation.[2]  Most of these comments concern intra-defendant issues that are not germane to the Court's consideration of the fairness of this settlement.  Under the highly deferential judicial review standard afforded to EPA consent decrees, the Court should find this Consent Decree to be fair, reasonable, and consistent with the objectives of CERCLA and RCRA, and should enter the Consent Decree.

## II.    BACKGROUND

### A.    The Site

The Site includes the location of the former Omega Chemical Corporation ("Omega Chemical"), a refrigerant and solvent recycling and treatment facility located in Whittier, California, and an area of groundwater contamination extending four miles or more to the south and west.  Omega Chemical operated from approximately 1976 to 1991, handling primarily chlorinated hydrocarbons and chlorofluorocarbons.  Drums and bulk loads of waste solvents and chemicals from various industrial activities were processed at the facility to form commercial products.  As a result of these operations, subsurface soil and groundwater have high concentrations of PCE, TCE, other chlorinated hydrocarbons, Freons, and other contaminants.  Ex. A (Consent Decree), App. A (Record of Decision), §2.1.

EPA commonly divides complex Superfund sites into Operable Units ("OUs") to facilitate organization of remedial action.  The Omega Site has three such units.  OU1 includes the former Omega Chemical facility and immediate vicinity.  OU2 – the subject of this Consent Decree – includes the contamination in groundwater downgradient of OU1 that originated from the Omega Chemical facility, which contamination has commingled with chemicals released at other source areas/facilities at the Site to form a regional groundwater plume.  OU3

---

[2] *Alcoa, Inc., et al, v. APC Investments Co., et al.*, 2:14-cv-06456-GW (C.D. Cal.).

refers to vapor intrusion from the Omega Site into several buildings on and near the Omega property.   Ex. A (Consent Decree) ¶G; *id.* Appendix A (Record of Decision) §2.1.  Pursuant to prior Consent Decrees and an Administrative Order on Consent ("AOC"), OPOG is leading the OU1 and OU3 investigation and cleanup. Exs. E-G (prior Consent Decrees and AOC).  EPA has, to date, led the investigation for OU2.

### B.   The Settling Defendants

The Settling Defendants include over 200 parties ("generators" or "arrangers") that sent wastes to the Omega Chemical facility.  Sixty-five of these generators are members of OPOG, and are considered "Settling Work Defendants" for purposes of this Consent Decree.  *See* Ex. A (Consent Decree), App. E.  An additional 169 generators (and two other parties, described later in this paragraph) have "cashed out" to OPOG members via internal agreements and are denominated "Settling Cash Defendants" for purposes of this Consent Decree.  *Id.,* App. D. However, these parties have <u>not</u> "cashed out" to the United States in exchange for a full release of liability at OU2 or at the Site; rather, they have received covenants and contribution protection for past response costs, future response costs related to the Work, and the Work performed by Settling Work Defendants.  *Id.* ¶¶59-60.

The Settling Defendants also include three parties (Settling Work Defendant McKesson Corporation, and Settling Cash Defendants Burke Street LLC and the related Stadler Family Limited Partnership) who owned or operated facilities within OU2, downgradient of Omega Chemical.  Doc. No. 1 (Complaint), ¶¶20-25.

### C.   Procedural History

#### 1.   Brief Description of Prior Settlements and Response Actions

EPA issued an initial administrative order in 1995 pursuant to which 147 parties, many of which later formed OPOG or associated with OPOG, removed the barrels of waste from the Omega Chemical facility.  Ex. H (1995 order, as amended).  EPA then placed the Site on the National Priorities List ("NPL"), a list

3

of the most highly contaminated Superfund sites, in 1999.  *See* 64 Fed. Reg. 2950-01 (Jan. 19, 1999).  EPA also entered into consent decrees in 2001 and 2010, in which OPOG members and associated settling cash defendants agreed to pay a portion of EPA's OU1 past costs and to perform the OU1 remedial design/remedial action work.  OPOG members have also performed work at OU3 pursuant to a 2009 AOC.  Exs. E-G.

Several federal agencies, including the military services, the U.S. Department of Agriculture, and the U.S. Department of Energy, were among the hundreds of generators that sent waste to the Omega Chemical facility; these federal defendants settled out to OPOG in 2006 for any claims OPOG members might have against them at the Site.  Ex. I (federal defendants' settlement).  EPA was not a party to that settlement.

### 2.    The 2011 Record of Decision (ROD) for OU2

On September 20, 2011, EPA issued the *Interim Action Record of Decision – Omega Chemical Corporation Superfund Site Operable Unit 2, Los Angeles, County, California 9/20/11* ("ROD"), which selects as the Interim Remedy for OU2 a groundwater pump-and-treat system intended to limit further movement of contaminated groundwater.  The overall objective of the ROD is to protect human health and the environment by preventing further spreading of the contaminated groundwater to as yet uncontaminated portions of the aquifer and nearby production wells.  *See* Ex. A (Consent Decree), App. A (ROD), §1.4.  The ROD also reflects that there are known sources that have contributed to groundwater contamination within the OU2 plume but for which cleanup actions have not yet been selected, as well as other potential but unconfirmed source areas contributing to the contamination; and that additional data is needed to identify a complete list of sources and remedial actions.  *Id.*  Components of the remedy in the ROD include the installation of extraction wells; construction of groundwater treatment facilities and associated piping; delivery of treated water to one or more local

drinking water purveyors, or, if EPA determines the required agreements cannot be reached in a timely manner, reinjection of the treated water into the aquifer;[3] and installation of new monitoring wells. The ROD identifies three general areas in which extraction wells may be appropriate: the Northern Extraction Area, Central Extraction Area, and Leading Edge Area.[4]  *Id.* §2.9.2.

### 3.    General/Special Notice for Operable Unit 2

From 2007 to 2010, and again in 2012 and 2013, EPA sent General Notice Letters notifying recipients that EPA had identified them as PRPs at OU2.  In 2012, following issuance of the ROD, EPA sent out Special Notice Letters, as authorized by Section 122(e) of CERCLA, to previously identified PRPs, explaining why EPA believed them liable, informing them of EPA's plan for OU2 cleanup, and inviting them to participate in negotiations with EPA to conduct cleanup work and pay past and future costs.  *See* Ex. D (Praskins Decl.) ¶10 (describing notice letters and categories of nonsettling parties who received them); *see also* 42 U.S.C. § 9622(e) (describing process generally).

### 4.    Lodging of this Proposed Consent Decree (Including Comments)

The Plaintiffs concluded negotiations with the Settling Defendants by simultaneously filing a Complaint and lodging this Consent Decree on April 20, 2016.  (Docs. No. 1 and 4.)  The Complaint, which seeks cost recovery and

---

[3] EPA has since determined that reclamation and spreading are also acceptable uses of the treated water, and removed the preference for delivery of the treated water to local drinking water purveyors.  *See* Ex. J (Explanation of Significant Differences, issued on June 10, 2016) ("ESD").

[4] As described below, *see infra* at 7, the Consent Decree Work is a subset of the potential remedial work described in the ROD, but does not alter that ROD except insofar as reflected in the ESD, *see supra* n.3.

declaratory and injunctive relief at OU2, names only the Settling Defendants.  The Plaintiffs have not brought contested litigation against any nonsettling OU2 PRP.

The Plaintiffs published notice of the Consent Decree in the Federal Register on April 27, 2016, and accepted public comments for a period of 30 days thereafter.  81 Fed. Reg. 24885-01 (Apr. 27, 2016).  Seven public comments were received, one of which has since been withdrawn.  *See* Ex. K (withdrawal of Mission Linen Supply Company comment); Ex. L (Tr. of *Alcoa* hearing), at 16 (announcing agreement in principle between Mission Linen and OPOG).  Four of the remaining six comments are from PRPs (Palmtree Acquisition Corporation, Phibro-Tech, Inc./First Dice Road Company, Pilot Chemical Corp., and Union Pacific Railroad Company) that have not been sued by the United States, but that have received Special Notice Letters from the United States and that are defendants to the private *Alcoa* case brought by OPOG members; two comments are from water providers (Golden State Water Company and the Water Replenishment District of Southern California)[5].  The first four comments, but not the two water providers' comments, raise objections to the fairness of the Consent Decree.  These six comments are attached as Exhibits M through R.   The United States also held a public meeting in Whittier, near the Site, on August 18, 2016.  A transcript is attached; there were no questions from the public, only from DTSC staff.  *See* Ex. U (public meeting transcript).

### III.   SUMMARY OF THE PROPOSED CONSENT DECREE

#### A.   Work Commitments

The 65 members of OPOG, together with McKesson Corporation, are the Settling Work Defendants and have committed to perform the entirety of the Work

---

[5] One other comment, from a neighboring hospital (Presbyterian Intercommunity Hospital, Inc.), was sent as a letter to EPA rather than through the formal comment process.  This letter and EPA's response are briefly described below at page 25, note 14, and are also attached as Exhibits S and T.

described in the Consent Decree and accompanying Statement of Work ("SOW"). Ex. A (Consent Decree), ¶7; *id.* App. B (SOW). The Work defined in the Consent Decree and the SOW does not cover the entirety of the potential remedial action described in the ROD. Ex. A ¶O; *id.* Apps. A and B (ROD and SOW). Rather, the Work covers the full cleanup described in the ROD for the Northern Extraction Area, the Central Extraction Area, a portion of the Leading Edge Area, and additional investigation work in the Leading Edge Area. *Id.* ¶¶O-P. The work to be performed will include the design, construction, and operation of one or more groundwater extraction and treatment systems to remediate the Northern Extraction Area, the Central Extraction Area, and the northern portion of the Leading Edge Area. *Id.* Additional investigation is planned before designing and implementing the remedial action for the most distant portion of the Leading Edge Area, where the extent of contamination is more uncertain. Accordingly, the SOW requires such additional investigation work but does not require remedial design or remedial action in the Leading Edge Area. *Id.; see also* Ex. D (Praskins Decl.) ¶¶8-9. Such further remedial design or remedial action remains within the scope of the ROD – the Consent Decree does not purport to change the ROD's scope – but is outside the scope of what the Settling Defendants will be performing pursuant to the Consent Decree.[6]

    The remedy that the Settling Defendants have agreed to fund and perform constitutes approximately two-thirds of the geographical span of the interim remedial action identified in the ROD, as well as the investigative work to assist EPA in determining whether to implement the remaining portion of the ROD or later to propose a change to that portion. Ex. D (Praskins Decl.) ¶¶8-9. This

---

[6] EPA has not determined who will be responsible for any further work needed in the Leading Edge Area. The Consent Decree explicitly states that it does not resolve Settling Defendants' responsibility for any such further work. Ex. A (Consent Decree) ¶P.

remedy will address the groundwater contamination in OU2 to mitigate threats to human health and the environment posed by the presence of volatile organic compounds (*e.g.*, PCE and TCE) and other contaminants in the groundwater. *See* Ex. A (Consent Decree), App. A (ROD) §§2.4.2, 2.1.

## B.   Past and Future Response Costs; Additional Financial Commitments

The Settling Defendants will pay the United States $8 million in Past Response Costs that will be placed in the Omega Site special account, and will also pay DTSC $70,000 in past costs. Ex. A (Consent Decree) ¶28. EPA's unreimbursed OU2 past costs as of the date of Consent Decree lodging were approximately $23 million, and DTSC's unreimbursed OU2 past costs were $70,000. Ex. B (Ortesi Decl.) ¶6; Ex. C (Amirebrahimi Decl.) ¶4. In addition, the cost-sharing provisions described below provide that if OPOG recovers funds from certain other nonsettling PRPs in the future, those funds will be shared in part with EPA to continue to defray EPA past costs. *See infra* at 9-10.

The Settling Work Defendants will pay the future response costs incurred by EPA and DTSC in overseeing the response actions covered by the proposed Consent Decree. *See* Ex. A (Consent Decree) ¶29. They will also provide a performance guarantee equivalent to the estimated cost of the Work, $70 million. *Id.* ¶21.

## C.   Covenants Not to Sue and Contribution Protection for Matters Addressed

In exchange for the actions to be performed and the payments that will be made pursuant to the proposed Consent Decree, Settling Defendants will receive covenants not to sue under CERCLA Sections 106 and 107 and RCRA Section 7003, and for parallel state provisions, for Plaintiffs' past OU2 response costs, Plaintiffs' future OU2 response costs related to the Work, and the Work performed by the Settling Defendants. *Id.* ¶¶59-60. The Consent Decree states that Settling Defendants are entitled to contribution protection under Section 113(f)(2) of

CERCLA for the same "matters addressed" in the Consent Decree.  *Id.* ¶81 (Effect of Settlement) and ¶4 (definition of Matters Addressed).  Other matters are subject to Plaintiffs' reservations of rights.  *Id.* ¶¶61-62, 64.

### D.   Cost-Sharing Between the United States and OPOG Members for "Certain Noticed PRPs"

The Consent Decree sets forth several provisions to facilitate settlement with additional parties.  First, OPOG members and the United States have agreed to a cost-sharing method for additional costs recovered from "Certain Noticed PRPs," regardless of whether it is the United States or OPOG that receives such payments, so long as the United States finds those payments to be fair, reasonable, and consistent with statutory goals.

Paragraph 75 of the Consent Decree provides for EPA and OPOG to share any payments recovered from certain other noticed PRPs, according to the following formula: OPOG will receive the first $6 million gross from these PRPs; after the first $6 million, costs recovered from these PRPs will be shared between EPA (receiving 30% of these costs) and OPOG (70%).  There is a cap of $7 million on remittances to EPA (beyond the $8 million past costs payment that Settling Defendants themselves are making in this Consent Decree).  In addition, PRPs who settle as "ability-to-pay" parties[7] will not be subject to this cost sharing formula; any settlement money from such parties will go to EPA.  Ex. A, App. G. The cost-sharing terms also do not include nonsettling parties who were generators of waste sent to the Omega facility; however, the group of Settling Cash Defendants may later be expanded to include such generators via subsequent modification of the Consent Decree.  Ex. A, ¶79.

---

[7] Pursuant to Section 122(g)(7) of CERCLA, 42 U.S.C. § 9622(g)(7), EPA may make a determination that a PRP lacks the ability to pay its fair share of CERCLA liability, and then may enter into a settlement with such a party that reflects its limited ability to pay.

The list of Certain Noticed PRPs is not an exhaustive list of those parties EPA views as PRPs; it is merely the list of PRPs for which OPOG and the United States have reached an explicit agreement about how to split future monetary settlements related to the matters addressed in this Consent Decree. Thus, a settlement that a Certain Noticed PRP reaches with either OPOG or EPA will be honored by the other, subject only to the requirement that EPA determine the settlement fair, reasonable, and consistent with CERCLA. At least two Certain Noticed PRPs have already availed themselves of this procedure; Burke Street LLC (and the associated Stadler Family Limited Partnership) joined the instant Consent Decree shortly before lodging, and Mission Linen has recently announced an agreement in principle with OPOG, which, if approved by United States officials, will result in an amendment to the Consent Decree to add parties, subject to Court approval. Ex. L (Tr. of *Alcoa* Hearing, at 16).

### E. <u>Other Agreements Regarding Future Settlements</u>

If EPA settles with additional OU2 parties in the future, all Settling Defendants commit to provide those future settlors the same covenants and releases as they provide to each other in this Consent Decree. *Id.* ¶78. Nothing in this Consent Decree limits the liability of, or future work obligations that may be required from, PRPs – either those settling herein or non-settling PRPs – with respect to the balance of work required to complete the ROD. *Id.* ¶P.

## IV. <u>ARGUMENT</u>

The inquiry into whether an EPA environmental consent decree is fair, reasonable, and consistent with the purposes of the statute is deferential and is based on the particular issues presented by each site and settlement:

> Congress intended, first, that the judiciary take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties; and second, that the district courts treat each case on its own merits, recognizing the wide range of potential problems and possible solutions. [T]here can be no easy-to-apply check list of relevant factors.

*United States v. Cannons Eng'g Corp. (Cannons II)*, 899 F.2d 79, 85-86 (1st Cir. 1990).

At this Site, cooperative PRPs have stepped forward to perform the majority of OU2 work.  They are not the only PRPs responsible for the contamination at OU2, but they are the only parties that have volunteered to perform the remedy. This Work commitment is at the heart of the proposed Consent Decree, and serves CERCLA's policies of promoting cleanup, encouraging settlement, and encouraging PRPs to perform work.  CERCLA permits and even directs EPA to provide incentives for those parties that settle early, even if this means that later settlors or nonsettlors bear disproportionate liability.  *Cannons II* at 91-92 (citing 42 U.S.C. § 9613(f)(2)).  Here, the risk of any disproportionality is borne by the Settling Defendants, who did not cause 100% of the need for the Work but are agreeing to perform it.  The Settling Defendants are performing the Consent Decree Work in its entirety, at their own expense, bearing the risk of overruns, and are paying EPA and DTSC oversight costs for that work; they may pursue contribution claims against nonsettling parties within the scope of the Work they are performing, but such claims are subject to contested litigation in other proceedings (including the *Alcoa* case), and will only be successful in those proceedings if the Court determines that the Settling Defendants have in fact shouldered liability in excess of their equitable shares. 42 U.S.C. § 9613(f)(1).  The only compromise that Plaintiffs are making in this Consent Decree is in allowing an $8 million payment from the Settling Defendants out of EPA's estimated $23 million unreimbursed OU2 past costs.  It is not uncommon for EPA to compromise past costs in work settlements, especially for early settlors.  *United States v. Davis*, 261 F.3d 1, 48 (1st Cir. 2001) ("CERCLA clearly anticipated that some settlements . . . would cover only a portion of the total cleanup costs for a hazardous waste site."); *see also Cannons II* at 91-92.  This $8 million reduces the costs, dollar for dollar, for which any subsequent settlors or nonsettlors may be held jointly and

severally liable to EPA.  Plaintiffs are continuing to pursue settlement with additional parties.

This Consent Decree was the product of approximately two years of arm's length negotiation between the Plaintiffs, represented by litigation counsel at the U.S. Department of Justice and the California Attorney General's Office, and many sophisticated Settling Defendants.  There was no procedural or substantive unfairness.  The remedy is technically reasonable, and the Consent Decree accomplishes a great deal of remedial work, furthering the public interest and the objectives of CERCLA and RCRA.  The Court should approve this settlement.

## A.  Under the Applicable Legal Standard, the Court's Inquiry Is Deferential

The standard for approval of a CERCLA federal settlement is whether it is "reasonable, fair, and consistent with the purposes that CERCLA is intended to serve."  *United States v. Montrose Chem. Corp. of Calif.*, 50 F.3d 741, 743 (9th Cir. 1995) (quoting *Cannons II* and legislative history) (internal quotations omitted). Approval of a settlement is committed to the informed discretion of the district court.  *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).  Such discretion should be "exercised in light of the strong policy in favor of voluntary settlement of litigation."  *United States v. Cannons Eng'g Corp. ("Cannons I")*, 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990) ("*Cannons II*"); *see also Randolph*, 736 F.2d at 529.  CERCLA has explicit provisions favoring settlement, especially settlements in which PRPs agree to perform work.  42 U.S.C. §§ 9622(a), 9622(d)(1); *see also Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.* 710 F.3d 946, 971 (9th Cir. 2013) ("'[O]ne of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation.'") (internal citations omitted).

Courts show deference to an agency's expertise when reviewing a proposed settlement.  *Cannons I*, 720 F. Supp. at 1035; *Randolph*, 736 F.2d at 529.  That policy is "strengthened when a government agency charged with protecting the

public interest 'has pulled the laboring oar in constructing the proposed settlement,'" as the Department of Justice and EPA have done here. *Montrose*, 50 F.3d at 746 (quoting *Cannons II*, 899 F.2d at 84); *Arizona v. City of Tucson*, 761 F.3d 1005, 1013 (9th Cir. 2014) (stating that EPA is owed considerable deference). As the Ninth Circuit stated, while "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, a district court reviewing a proposed consent decree 'must refrain from second guessing the Executive Branch.'" *Montrose*, 50 F.3d at 746 (quoting *Cannons II*, 899 F.2d at 84). The balancing of competing interests reflected in a proposed settlement "must be left, in the first instance, to the discretion of the Attorney General." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).

"A consent decree is essentially a settlement agreement subject to continued judicial policing. It is not a decision on the merits . . . , but is the product of negotiation and compromise." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (citations and internal quotations omitted). Accordingly, in reviewing a consent decree, a court should not substitute its own judgment as to optimal settlement terms for the judgment of the litigants and their counsel. *United States v. Akzo Coatings of Amer., Inc.*, 949 F.2d 1409, 1425 and n.12 (6th Cir. 1991). Nor should it inquire "whether the settlement is one which the court itself might have fashioned, or considers as ideal," *Cannons II,* 899 F.2d at 84, or seek to determine whether the proposed settlement provides for "every benefit that might someday be obtained in contested litigation," *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 850 (5th Cir. 1975). Rather, the Court should approve the settlement if it determines that the settlement is fair and reasonable, and resolves the controversy in a manner consistent with the public interest. *Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117, 1126 (D.C. Cir. 1983); *Oregon*, 913 F.2d at 580. In conducting its review, the trial court may not modify the terms of the parties' agreement – it may only approve or reject the settlement as a whole. *Officers for*

*Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). The Court need not conduct discovery or an evidentiary hearing. *See United States v. Albert Inv. Co.*, 585 F.3d 1386, 1396 (10th Cir. 2009) (cited with approval in *United States v. Aerojet General Corp.*, 606 F.3d 3d 1142, 1150 (9th Cir. 2010)); *Cannons II* at 94; *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081,1085 (1st Cir. 1994).

### B.    The Settlement Is Fair

To assess the fairness of a settlement, the Court must look to both procedural and substantive fairness. *Montrose*, 50 F.3d at 746.

### 1.    The Fairness of This Settlement Should be Assessed in the Aggregate

In evaluating a settlement in which a large number of settling defendants negotiated among themselves to bring a joint offer to the United States, the Court need not inquire into the individual shares of each settling defendant. Rather, the Plaintiffs and the Court may assess the fairness of the settlement as a whole. *See Charles George Trucking, Inc.*, 34 F.3d at 1086 (stating that court may consider fairness in the aggregate for groups of settlors, and "endors[ing], in general, EPA's practice of negotiating with a representative group of PRPs and then permitting the group members to divide the burden of the settlement among themselves"); *see also United States v. Kramer*, 19 F.Supp.2d 273, 282 (D.N.J. 1998) ("Instead, both [federal and state] plaintiffs engaged in the well-recognized (and practically imperative) practice of negotiating an overall settlement with a representative group of PRP's."); *United States v. GenCorp Inc.*, 935 F. Supp. 928, 934-35 (N.D. Ohio 1996) (approving settlement despite objection that it did not disclose "the settlement amounts, the proportion of liability assessed to each party, and the rationale for such determinations"); *United States v. Mid-State Disposal Inc.*, 131 F.R.D. 573, 577 (W.D. Wis. 1990) (court need not "scrutinize the allocation of liability among the potentially responsible parties").

1    This principle is further strengthened here, where no party is finally cashing

2    out its liability to the United States or DTSC.  Accordingly, the objections raised

3    by commenters regarding EPA's lack of knowledge of the individual shares paid

4    by the 171 "Settling Cash Defendants" are irrelevant.  The Plaintiffs have, and the

5    Court has, sufficient evidence to judge the fairness of the settlement as a whole, by

6    comparing what the defendants are providing in this settlement – an open-ended

7    Work commitment, plus payments toward past costs and payment of all future

8    oversight costs for the Work – to what they are getting: a covenant for the Work

9    performed and for past costs.  Knowing the exact dollar amount paid by each of

10   171 individual settling cash defendants, who are jointly and severally liable to the

11   Plaintiffs, could not materially influence the Court's view of the Consent Decree's

12   fairness as a whole.  These intra-defendant issues are potentially relevant to the

13   private-party *Alcoa* case but are not germane to the Consent Decree's fairness.[8]

14              **2.      The Settlement is Procedurally Fair**

15       Courts typically first examine procedural fairness to determine whether the

16   negotiation process was "fair and full of adversarial vigor."  *United States v.*

17   *Chevron U.S.A., Inc.*, 380 F.Supp.2d 1104, 1111 (N.D. Cal. 2005) (citation

18   omitted).  As the Ninth Circuit concluded in *United States v. Oregon*, if a

19   settlement is the product of good faith, arm's length negotiations, as this settlement

20   is, see above at page 12, it is "presumptively valid and the objecting party has a

21   'heavy burden of demonstrating that the decree is unreasonable.'"  *Oregon*, 913

22   _____

23       [8] This structure has been followed in previous consent decrees at the Omega

24   Site.  Exs. E, F (2001 and 2010 OU1 Consent Decrees).  The Omega OU1 Consent

25   Decrees involved roughly the same settling PRPs (OPOG members as "settling

     work defendants," with some changes in membership over time, and many of the

26   same additional "settling cash defendants").  In those Consent Decrees, OPOG

27   members also agreed to perform the cleanup work and pay for EPA's ongoing

     costs, and defendants also received a covenant for the work performed.  Ex. E, ¶¶

28   7, 42-43, 71-72, and Apps. C-D; Ex. F, ¶¶ 6, 48-49, 79-80, and Apps. C-D.

1   F.2d at 581 (quoting *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)); *see*

2   *also Cannons II*, 899 F.2d at 87.

3          Construed generously, one of the submitted comments – that of Palmtree

4   Acquisition Company – raises concerns of procedural fairness, albeit only with

5   unsupported allegations.  First, Palmtree asserts that the government is

6   inappropriately self-dealing because a group of federal agencies that were among

7   the hundreds of generators that sent hazardous substances to the Omega Chemical

8   facility previously settled out their liability to OPOG.  *See* Ex. I (federal

9   defendants' settlement).  The fairness of the 2006 settlement was not challenged at

10  the time, and may not be challenged here.  It is common for United States agencies

11  to be PRPs at an EPA Superfund Site.  The fact that United States agencies were

12  among the previous settlors does not somehow make the instant Consent Decree

13  between the United States, on behalf of EPA, and the Settling Defendants

14  procedurally inappropriate.  This concern, which is discussed further in Section

15  IV.E.1.f. below in the context of responses to specific comments, is unfounded.

16  Similarly, Palmtree's assertion that DTSC is inappropriately settling with itself

17  because California state agencies appear among the list of settling defendants in

18  this Consent Decree misconstrues the relationship among California agencies.  The

19  State of California does not have a unitary system of government, but instead a

20  system of divided executive power.  *Marine Forests Soc. v. California Coastal*

21  *Comm'n*, 36 Cal.4th 1, 31 (Cal. 2005).  Accordingly, each individual state agency is

22  considered a separate legal entity, and custody and control over materials by one

23  state agency is not imputed to a separate state entity such as DTSC.  *People ex rel.*

24  *Lockyer v. Superior Court (Cole National Corp.)*, 122 Cal.App.4th 1060, 1078 (Ct.

25  App. 2004) ("Each agency or department of the state is established as a separate

26  entity, under various state laws or constitutional provisions.").  Also unfounded is

27  Palmtree's insinuation that the United States has relinquished control of EPA's

28  future settlements to OPOG.  This is not the case.  Rather, the Consent Decree

provides that if EPA settles with any PRP, OPOG must supply its own releases and covenants to that defendant, unless OPOG wishes to oppose entry of the EPA consent decree with a future settlor.  If OPOG settles with a PRP, EPA may only provide its covenants and contribution protection to that settlor if EPA is satisfied that the settlement is fair, reasonable, and consistent with the statutes.[9]

### 3.    The Settlement is Substantively Fair

The leading cases regarding the standard for entry for a CERCLA Consent Decree – most notably the Ninth Circuit case *Montrose*, and the First Circuit case *Cannons Engineering* – concern situations in which parties paid fixed dollar amounts to fully and finally settle their liability to the United States at a Superfund site.  In fact, all cases relied upon by the commenters – *Montrose*, *Arizona v. Tucson*,[10] and *Charter International Oil*[11] – exhibit this fact pattern.  It is not surprising that courts, in evaluating such "cash-out" settlements, will assess

---

[9] The Plaintiffs further note that OPOG is not a monolith.  It is a group currently comprising 65 members, which also has associated with the McKesson Corporation and 171 Settling Cash Defendants.  The OPOG parties and generator Settling Cash Defendants are similarly situated only insofar as they all sent waste to the Omega Chemical facility – they include large corporations, public agencies, and individuals, who sent widely varying types and amounts of waste.  OPOG's membership has varied over time.  *Compare, e.g.*, Exs. E, F (2001 and 2010 Consent Decrees), App. D, *with* Ex. A (current Consent Decree), App. F.

[10] *Arizona v. Tucson* presents particularly different facts from those at issue here.  The *Arizona* court was careful to note that its review of a state consent decree was less deferential than that of an EPA consent decree.  Any verbiage in *Arizona* about whether that consent decree would have passed muster had EPA been a party is *dicta*.  In addition, the case concerned a settlement in which numerous parties were declared "*de minimis*" and given full site releases in exchange for a payment of money, the Court held, without sufficient documentation.  *Arizona*, 761 F.3d at 1009, 1012-13.  This Consent Decree involves no *de minimis* parties, no parties receiving a full site release, and the performance of significant cleanup work by the settling parties.  The facts of *Arizona* in no way resemble those of the case at bar.

[11] *United States v. Charter International Oil Company*, 83 F.3d 510 (5th Cir. 1996).

substantive fairness by comparing the amount the settlors are paying to the amount of total site costs, and ascertaining that that proportion bears some relation to the settlors' proportionate share of liability for overall site costs. *See, e.g., Montrose* at 747 (comparing "the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then . . . factor[ing] into the question any reasonable discounts . . . that may be justified"). Even in cash-out settlements, such a calculation is not formulaic. *Id.; Cannons II* at 88.

This, in contrast, is a settlement for cleanup, rather than a settlement for a fixed amount of money. The Settling Defendants are early volunteers, taking on open-ended liability for cleanup in exchange for a limited covenant. Here, EPA's discretion to compromise past costs (or any other aspect of its claims) for those settlors is at its height: "[T]wo frequently encountered reasons warranting departure from strict formulaic comparability are the uncertainty of future events and the timing of particular settlement decisions. Common sense suggests that a PRP's assumption of open-ended risks may merit a discount on comparative fault . . . . By the same token, the need to encourage (and suitably reward) early, cost effective settlements . . . can affect the construct." *Cannons II* at 88.[12]

In this case, EPA has not even departed from rough proportionality. The Settling Defendants are collectively providing an estimated $78 million in value – a projected $70 million in work value (though the cost of the work may in time

---

[12] As a general matter, EPA is permitted to offer incentives for early settlement, leaving later settlors with disproportionate liability; such incentives are explicitly contemplated by the statute and are not considered unfair. *See Charter Oil*, 83 F.3d at 515 ("[CERCLA's] statutory framework contemplates that [responsible parties] who do not join in a first-round settlement will be left with the risk of bearing a disproportionate share of liability."); *Cannons II*, 899 F.2d at 91; *United States v. Fort James Operating Co.*, 313 F.Supp.2d 902, 909 (E.D. Wis. 2004) ("Given CERCLA's joint and several liability scheme, the government may find it appropriate to offer relatively favorable terms to early settlors.").

exceed that projection, and thus the settlors are taking on an open-ended risk) and over $8 million in past costs – and receiving covenants not to sue and contribution protection for an estimated $93 million worth of the United States' and DTSC's CERCLA claims ($70 million worth of Work plus approximately $23 million in past costs). Taking the Work and past costs together, the $78 million they are contributing represents 84% of the $93 million for which they are receiving covenants not to sue. This is an exceedingly robust share, when we take into account how many parties are outside the settlement and the fact that the only compromise being made by the public is that of EPA past costs. One party who is outside the settlement is Dennis O'Meara, the owner/operator of the Omega Chemical Facility. In reported cases at Superfund sites where landfills or recycling facilities are the source parcels of contamination, courts making formal allocations of liability have typically assigned substantial shares of overall site liability to the owners/operators of those source parcels. *See, e.g.*, *Amoco Oil Co. v. Dingwell*, 690 F. Supp. 78, 80, 87 (D. Maine 1988), *aff'd*, 884 F.2d 629 (1st Cir. 1989); *United States v. Davis*, 31 F.Supp.2d 45, 50-52 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001); *United States v. Consolidation Coal Co.*, 184 F.Supp.2d 723, 725 (S.D. Ohio 2002) (*aff'd in part, vacated in part on other grounds*, 345 F.3d 409 (6th Cir. 2003)).

In addition, EPA guidance provides that in cases where some parties are insolvent or otherwise unable to pay, settling defendants may, on appropriate facts, be credited up to 25% of site costs for what would have been the insolvent parties' fair share. *See* EPA's *Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-Critical Removals*, available at https://www.epa.gov/sites/production/files/2013-10/documents/orphan-share-rpt.pdf, at 4). There are insolvent PRPs for OU2. *See*, *e.g.*, Ex. A (Consent Decree) ¶77 (referencing bankruptcy of former OPOG member Reichhold Holdings US, Inc.). Courts addressing settlements may also

1    take such factors into account.  *United States v. Kramer*, 19 F.Supp.2d 273, 288

2    (D.N.J. 1988) (taking into account insolvent owner/operator share).

3           Also outside the settlement are many other non-settling generators of waste

4    sent to the Omega Chemical Facility, and owner/operators throughout the plume.[13]

5    In total, the nonsettling parties represent a variety of sources of liability and

6    environmental contamination at OU2 – owner/operator of the Omega Facility,

7    generators of waste sent to the Omega Facility, and owner/operators of industrial

8    parcels throughout OU2.  *See* Ex. D (Praskins Decl.) ¶¶10-12.

9           The paramount aspect of fairness is fairness to the public.  *Akzo Coatings*,

10   949 F.2d at 1435.  That element is manifestly met here, where the cleanup Work is

11   guaranteed at the Settling Defendants' expense.  Further, no commenter has

12   articulated a way in which this settlement is unfair to that commenting party.  The

13   settlement is procedurally and substantively fair.

14          **C.    The Settlement is Reasonable**

15          In a work settlement such as this, reasonableness is satisfied if the remedy

16   put forth is technically adequate to meet the remedial goals, and if comments on

17   this technical aspect were taken into account.  *Cannons II* at 89-90.  The public had

18   the opportunity to comment on the ROD in 2011, and EPA addressed those

19   comments; while the Statement of Work in the Consent Decree does not

20   encompass the entire geographical scope described in the ROD, it is consistent

21   _____

22   [13] *See* Ex. D (Praskins Decl.) ¶10 (describing categories of parties that have

23   received General and/or Special Notice Letters, indicating that EPA views them as

24   PRPs at OU2).  These nonsettlors include, among others: (a) many generators that

     sent waste to the Omega Chemical Facility; (b) the four adverse commenters in this

25   case (Palmtree Acquisition Corporation, Phibro-Tech, Inc./First Dice Road

26   Company, Pilot Chemical Corp., and Union Pacific Railroad Company), which are

     or were owner/operators of industrial facilities in the plume; (c) Continental Heat

27   Treating and ExxonMobil, owner/operators of downgradient industrial facilities

     within the Leading Edge Area; and (d) Angeles Corp. and related entities,

28   owner/operators of a facility near the Northern/Central Area boundary.  *Id.*

1    with the ROD.  The attached "Response to Technical Comments" addresses any

2    technical comments submitted regarding the Consent Decree.  Ex. D (Praskins

3    Decl.), Attachment A (Response to Technical Comments).  These comments do

4    not challenge the technical adequacy of the remedy.

**D.    The Settlement is Harmonious with CERCLA and RCRA**

6         As described above, the explicit objectives of CERCLA include: securing

7    environmental cleanup to protect human health and the environment; encouraging

8    PRPs to perform cleanup; recovering previously expended EPA costs; and

9    encouraging early settlement to avoid the expenditure of public money and time on

10   unnecessary litigation.  Upon entry of the Consent Decree, the OU2 Work can

11   begin.  Because the settlement accomplishes substantial cleanup, protects human

12   health and the environment, does so at PRPs' expense, provides for the payment of

13   significant past costs and of oversight costs, and avoids contested litigation, this

14   Consent Decree meets all the goals of CERCLA.

15        The Consent Decree also settles EPA's claims under section 7003 of RCRA,

16   42 U.S.C. § 6973, concerning the potential for imminent and substantial

17   endangerment to health or the environment.  This Consent Decree is consistent

18   with the purposes of Section 7003, because it abates the risk of such endangerment

19   to the environment.  *See* 42 U.S.C. § 6973.  No comments were specific to RCRA

20   concerns.  *See* Exs. M-R (public comments).

**E.    The Public Comments Received Do Not Provide a Reason Not to Enter the Consent Decree**

22        All comments received are attached to this Motion.  Exs. M-R.  The

23   following discussion groups the comments by subject area.

**1.    Comments Regarding Fairness/Reasonableness of Consent Decree**

26   a.    Comment: Because individual Settling Cash Defendants' payments are not

27   disclosed, EPA, the Court, and the public do not have sufficient information to

28   assess the fairness of the settlement. (Palmtree, Pilot, Union Pacific, Phibro-Tech)

   Response: For the reasons stated in Section IV.B.1 above, Plaintiffs and the Court need only assess the fairness of the settlement as a whole, without examining the individual amounts that each defendant paid the defendant group.

b. Comment: EPA has not disclosed its past cost figure, other than stating in its Complaint that OU2 unreimbursed past costs exceed $20 million.  (Union Pacific)

   Response: The estimated figure is $23 million.  Ex. B (Ortesi Decl.) ¶¶6-7.

c. Comment: EPA should issue an Explanation of Significant Differences or a ROD Amendment to Address Changes to the Remedy.  (Union Pacific)

   Response: The Consent Decree, lodged in April 2016, included a statement of EPA's intent to do so.  Ex. A (Consent Decree), at ¶L.  EPA issued this ESD on June 10, 2016.  The ESD is available on EPA's website, and a copy is also attached to this motion.  Ex. J; *see also supra* at 5, n.3.

d. Comment: The Settling Defendants' payment of $8 million in past costs against approximately $20 million in unreimbursed past costs, an approximately 40% share, "seems unfair and unreasonable." (Union Pacific)

   Response: For the reasons stated above in Section V.A.3, a strict numerical analysis is not necessary on these facts.  To the extent that the Court does find it appropriate, the numbers that should be compared are the total value of the Settling Defendants' commitment – at least $78 million – and the total value of the liability Plaintiffs agree not to pursue in return – $93 million.  Thus, the Settling Defendants are agreeing to perform approximately 84% – not 40% – of the total value for which they are receiving covenants not to sue in this settlement.

e. Comment: State of California may not sue and settle with itself.  (Palmtree)

   Response: See *supra* at 16 (description of state's non-unitary nature).

f. Comment: There is an unfair partnership between US and OPOG. (Palmtree) This comment suggests that, because of the previous federal defendants' settlements, it is inappropriate for EPA to engage in cost-sharing agreements with OPOG regarding future settlement monies that may be received from Certain

1  Noticed PRPs.  The comment also asserts that EPA has "outsourced the cost

2  recovery process."

3      Response: The first assertion – that there is somehow self-dealing in the

4  juxtaposition of the existence of the federal defendants' settlement with OPOG in

5  2006, to which EPA was not party, and the current Consent Decree, in which the

6  only money received by the United States is placed in Superfund-specific special

7  accounts for use at the Site – is without merit.  The federal agencies that were

8  among the hundreds of parties that sent waste to the Omega Chemical facility

9  resolved their liability in a settlement that was public, Court-approved, and did not

10  draw adverse comment at the time.  Its fairness may not be re-litigated now.

11      The second accusation is equally unjustified.  OPOG and McKesson have

12  signed up to do all the work for which they are being released, subject only to their

13  rights to seek contribution (to be determined in other non-EPA litigation) from

14  other PRPs.  The United States may, pursuant to CERCLA's statutory framework

15  of joint and several liability to the United States, look to one or a group of settlors

16  and then leave them to pursue contribution against others. 42 U.S.C. §§ 9607,

17  9613(f)(1); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1506-08 (6th Cir.

18  1989); *see also Burlington Northern & Santa Fe Ry. Co. v. United States,* 129

19  S.Ct. 1870, 1880-81 (2009) ("[D]efendants seeking to avoid joint and several

20  liability bear the burden of proving that a reasonable basis for apportionment

21  exists.").  The agreement between the United States and OPOG as to how money

22  should be shared from certain future settlors is merely a device to facilitate future

23  agreements, and is part of the complex consideration in this negotiated Consent

24  Decree.  The cost-sharing agreement is made public here, and is not part of a secret

25  partnership.  Furthermore, OPOG is not in charge of settlements: the Further

26  Settlors paragraph makes it clear that, if the United States deems someone a future

27  settlor, then OPOG must offer covenants to those settlors upon entry of the future

28  consent decree.  Ex. A (Consent Decree) ¶78.

g.      Comment: Jurisdiction section "includes language that seems calculated to serve OPOG's litigation interests rather than the public interest." (Palmtree)

Response: This comment references language in Paragraph 1 of the Consent Decree: "As provided for under Section 113(g)(2) of CERCLA . . . this action constitutes an 'initial action for the recovery of costs' at the Site within the meaning of that section, and any subsequent action by Plaintiff to recover any response costs under CERCLA Section 107 . . . for the Site, not addressed by this Consent Decree, constitutes a 'subsequent action.'"  The commenter misconstrues this Paragraph, which is included to make it clear that Settling Defendants acknowledge that this Complaint tolls the statute of limitations for the United States' claims against them at OU2, regardless of whether those claims are confined to matters addressed in this Consent Decree.  This obviates the need for Plaintiffs to secure tolling agreements from Settling Defendants for any remaining OU2 claims.  Its purpose is analogous to that of the uncontroversial sentence in the same paragraph that says settlors "waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District" – it manifests agreement not to litigate certain issues, saving transaction costs.

## 2.      Requests for Edits to Consent Decree

This Court may not modify the Consent Decree, but must either enter or decline to enter it as written. *See supra* at 13-14.  However, certain comments invited edits to the Consent Decree.  Plaintiffs decline to edit the Consent Decree.

a.      Comment: Consent Decree does not expressly designate settling parties as parties potentially responsible for Leading Edge. (Union Pacific)

Response: There is no compelling reason to redraft the paragraph cited by Union Pacific (Consent Decree ¶5b).  It is clear from the Consent Decree as a whole that no party has been released from liability for the Leading Edge.  This negotiated document does not, as the comment asserts, "reflect a finding that contamination in the LE is solely attributable to GNL and SNL recipients."  There

may be additional liable PRPs beyond that group.  Identifying these will be part of EPA's proceeding stepwise to analyze contamination and liability in different portions of the Site based on available data.  Nothing in the Consent Decree limits the universe of PRPs who may be held responsible for Leading Edge contamination, including settlors as well as nonsettlors and parties not yet noticed.

The water provider commenters have also raised potential edits to the description of the Work, which are addressed in the attached Response to Technical Comments.  Ex. D (Praskins Decl.), Attachment A.

### 3.    Other Technical Comments Regarding Statement of Work

Several commenters raised additional comments about technical aspects of the Statement of Work.  These comments are addressed in the attached Response to Technical Comments.  Ex. D (Praskins Decl.), ¶13 and Attachment A.[14]  Many of them regard issues that will be worked out in the remedial design process, and such comments will be further taken into account at the appropriate time.  *Id.*  The comments do not suggest that the settlement is not fair, reasonable, or consistent with the objectives of CERCLA and RCRA.

## V.    <u>CONCLUSION</u>

The Consent Decree is fair, reasonable, and consistent with CERCLA and RCRA.  Plaintiffs request that this Court enter the Consent Decree, preferably by signing page 86 of the Consent Decree, or else by issuing the attached Proposed Order, and by directing the Clerk to enter judgment pursuant to Federal Rule of Civil Procedure 58.

---

[14] Presbyterian Intercommunity Hospital's short informal comment, submitted by letter to EPA, asked only whether the OU2 Consent Decree alters the OU1 remedy. EPA responded that it does not.  Exs. S and T (letter and response).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

FOR THE UNITED STATES OF
AMERICA

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources
Division

_October 20, 2016_____          /s/ Deborah A. Gitin
Date                             DEBORAH A. GITIN
                                 KARL J. FINGERHOOD
                                 Senior Counsel
                                 Environmental Enforcement Section
                                 Environment and Natural Resources
                                 Division
                                 U.S. Department of Justice

FOR THE STATE OF CALIFORNIA on
behalf of the CALIFORNIA
DEPARTMENT OF TOXIC
SUBSTANCES CONTROL AND TOXIC
SUBSTANCES CONTROL ACCOUNT

KAMALA D. HARRIS
Attorney General of California
SARAH E. MORRISON
Supervising Deputy Attorney General

_October 20, 2016_____          /s/ Olivia W. Karlin_____
Date                             OLIVIA W. KARLIN
                                 Deputy Attorney General
                                 Attorneys for the State of California
                                 Department of Toxic Substances Control
                                 and Toxic Substances Control Account

1

1   OF COUNSEL FOR THE UNITED STATES OF AMERICA:
2   Hope Schmeltzer
3   Assistant Regional Counsel
    U.S. Environmental Protection Agency
4   Region 9

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE

**PROOF OF SERVICE**

***U.S. and State of California v. Abex Aerospace, et al.***

**United States District Court, Central District of California**

Case No.: 2:16-cv-02696-GW-E

I am an attorney at the United States DOJ Environmental Enforcement Section.  My business address is 301 Howard Street, Suite 1050, San Francisco, CA 94105.  I am over the age of 18 years and not a party to this action.

I hereby certify that on October 20, 2016, I electronically filed the following documents with the Clerk of the Court using CM/ECF, thereby serving these documents on all counsel who have appeared via the Court's electronic filing system.

- PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CONSENT DECREE
- PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO ENTER CONSENT DECREE
- PROPOSED ORDER

**DECLARATION OF DEBORAH A. GITIN**

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 20, 2016.

/s/ Deborah A. Gitin
DEBORAH A. GITIN

PROOF OF SERVICE TO PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENTER CD